IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| THE ALASKA LANDMINE, LLC, *et al.*,<br><br>                  Plaintiffs,<br><br>    vs.<br><br>MICHAEL J. DUNLEAVY, *et al.*,<br><br>                  Defendants. | Case No. 3:20-cv-00311-JMK<br><br>**ORDER GRANTING<br>PRELIMINARY INJUNCTION**<br>**(Docket 3)** |

This matter is before the Court on Plaintiffs' motion for Preliminary Injunction.[1] Defendants oppose the motion.[2] Plaintiffs have filed a reply.[3] On January 13, 2021, the Court held a hearing and heard oral argument on this motion. The Court has carefully considered the arguments raised by the parties. For the reasons set forth below, Plaintiffs' motion is GRANTED.

## I. INTRODUCTION

**A. Motion Presented**

---

[1] Docket 3.
[2] Docket 21.
[3] Docket 27.

Plaintiffs ask this Court for an order requiring Defendants to "recognize and treat Landfield equal to other members of the credentialed press."[4] Defendants argue that Plaintiffs are not entitled to preliminary injunctive relief on this matter because they have not met their burden of establishing a likelihood of success on the merits nor made other requisite showings.[5] In their reply, Plaintiffs argue that they have a cognizable free speech interest in accessing press conferences and that Defendants' actions impermissibly exclude him for content-based reasons.[6]

### B. Background

Plaintiff The Alaska Landmine, LLC (the "Landmine") is an online news site founded in October 2017.[7] Plaintiff Jeffrey Landfield is the owner and primary content contributor to The Alaska Landmine website. Mr. Landfield describes himself as a former political candidate who started his Alaska-focused political news blog in response to a reduction in local reporting, which he believes is necessary to a fully-informed public that can "hold [community leaders] accountable."[8] Defendants describe Mr. Landfield as a "blogger" and The Alaska Landmine as a blog, which "differs from traditional journalism in many ways" including how content is written, reviewed, posted or published, and how journalistic ethics are adhered to.[9] The Court will refer to Plaintiffs collectively unless it is necessary to distinguish between them.

---

[4] Docket 3 at 2.
[5] Docket 21 at 3.
[6] Docket 27 at 8–14.
[7] Docket 1-1 at 4–5.
[8] Docket 5 at 1–2.
[9] Docket 21 at 6–7.

*The Alaska Landmine, LLC et al., v. Dunleavy et al.*            Case No. 3:20-cv-00311-JMK
Order Granting Preliminary Injunction            Page 2

Case 3:20-cv-00311-JMK    Document 32    Filed 01/22/21    Page 2 of 19

Defendant Michael J. Dunleavy became the governor of Alaska in December 2018. Defendant Ben Stevens is the office of the governor's chief of staff. Defendant Jeff Turner is Deputy Communications Director for the governor, who has interacted with Mr. Landfield in this capacity since taking over from his predecessor in October, 2019.[10] The Court will refer to Defendants collectively unless it is necessary to distinguish among them.

Defendant Governor Dunleavy and his press office regularly communicate with the media in "numerous ways."[11] One method is the governor's press conferences, which Defendants explain are "on-the-record events, called ad hoc, at which the Governor provides information on a specific topic."[12] At some press conferences, some attending members of the press are invited to ask questions.[13]

The COVID-19 pandemic has changed the way Defendants conduct press conferences.[14] Press conferences are now held remotely, via Zoom or general videoconference, and are largely available to members of the general public in real time. Defendants keep a "media advisory list" which they use to email certain members of the press and communications offices of other organizations in advance of scheduled press conferences, which sometimes are announced with less than a day's notice.[15]

---

[10] *See* Dockets 21 at 21 n.70; 4 at 10, 17.
[11] Docket 21 at 3.
[12] *Id*.
[13] *Id*.
[14] *Id*. at 4.
[15] *Id*. at 5.

*The Alaska Landmine, LLC et al., v. Dunleavy et al.*                     Case No. 3:20-cv-00311-JMK
Order Granting Preliminary Injunction                                                                   Page 3

Case 3:20-cv-00311-JMK    Document 32    Filed 01/22/21    Page 3 of 19

This administration does not have a process to allow members of the press access or attendance to press conferences.[16] Defendants claim to have "exercised discretion" when sending invitations to journalists about press conferences, "like prior administrations" have.[17] Defendants allege that "press corps has generally understood that invitations are discretionary and an invitation to one press conference does not guarantee an invitation to the next."[18]

Plaintiffs allege Defendants' wrongdoing began in October 2019, nearly a year after the governor took office, with a personnel change in the governor's communications department.[19] Prior to the personnel change, Mr. Landfield, who at the time held an Alaska State Legislature press pass,[20] was invited to in-person press conferences by the then-press secretary. After that individual left, Mr. Landfield no longer received invitations to gubernatorial press conferences. He requested invitations after October 2019 but has not received any since.[21] Plaintiffs allege that Defendant Turner once wrote to Mr. Landfield that the exclusion from the invitee list was an "oversight."[22] When the governor began to give virtual press conferences due to the COVID-19 pandemic, Mr. Landfield accessed those conferences after hearing about them elsewhere.[23] Mr. Landfield has not been invited to ask a question of the presenters at press conferences.

---

[16] *Id*. at 3–4.
[17] *Id*. at 4.
[18] *Id*. at 4.
[19] Docket 5 at 8.
[20] Press passes are not issued to anyone by the governor's office. *See* Docket 21-3 at 8.
[21] Docket 5 at 9.
[22] Dockets 5 at 9; 5-18 at 2.
[23] Docket 5 at 11.

*The Alaska Landmine, LLC et al., v. Dunleavy et al.*      Case No. 3:20-cv-00311-JMK
Order Granting Preliminary Injunction      Page 4

Case 3:20-cv-00311-JMK   Document 32   Filed 01/22/21   Page 4 of 19

Plaintiffs allege a violation of the First Amendment. They also allege a corresponding violation of their due process rights. Plaintiffs ask this Court for a preliminary injunction ordering Defendants to include them on their media advisory list and to treat them like any member of the mainstream (traditional) media.

## II. LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right."[24] As articulated in *Winter*, the moving party must establish each of the following: (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest. *Id*. However, the Ninth Circuit does afford a certain level of malleability to this four-prong test.[25]

Following *Winter*, the Ninth Circuit addressed the first element—the likelihood of success on the merits—and held that its "serious questions" approach to preliminary injunctions was still valid "when applied as a part of the four-element *Winter* test."[26] Accordingly, if a plaintiff shows "that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips *sharply* in the plaintiff's favor."[27] "Serious questions are 'substantial, difficult, and doubtful,' as to make them a fair ground

---

[24] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).
[25] *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011).
[26] *See id.* at 1131–35.
[27] *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014) (emphasis in original) (quoting *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013)).

*The Alaska Landmine, LLC et al., v. Dunleavy et al.*  Case No. 3:20-cv-00311-JMK
Order Granting Preliminary Injunction  Page 5

Case 3:20-cv-00311-JMK   Document 32   Filed 01/22/21   Page 5 of 19

for litigation and thus for more deliberative investigation."[28] They "need not promise a certainty of success, nor even present a probability of success, but must involve a 'fair chance on the merits.'"[29] All four *Winter* elements must still be satisfied under this approach,[30] but analyses of the last two elements—harm to the opposing party and consideration of the public interest—merge when the government is the opposing party.[31] Ultimately, "[a] preliminary injunction ... should not be granted unless the movant[s], by a clear showing, carr[y] the burden of persuasion.'"[32]

It is also important to note that a preliminary injunction can take two forms. A prohibitory injunction prohibits a party from taking action and "preserve[s] the status quo pending a determination of the action on the merits."[33] A mandatory injunction "orders a responsible party to 'take action.'"[34] A mandatory injunction "'goes well beyond simply

---

[28] *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 422 (9th Cir. 1991) (quoting *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988)); *see also Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1273 (N.D. Cal. 2014) ("'Serious questions' refers to questions 'which cannot be resolved one way or the other at the hearing on the injunction and as to which the court perceives a need to preserve the status quo . . . .'" (quoting *Gilder*, 936 F.2d at 422)).

[29] *Gilder*, 936 F.2d at 422 (quoting *Republic of the Philippines*, 862 F.2d at 1362).

[30] *See All. for the Wild Rockies*, 632 F.3d at 1135 ("Of course, plaintiffs must also satisfy the other *Winter* factors."); *see also, e.g.*, *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 944 (9th Cir. 2013) (describing standard for preliminary injunction).

[31] *Nken v. Holder*, 556 U.S. 418, 435 (2009). The merger of the last two elements does not mean that these factors always weigh in the government's favor. The Supreme Court recognized in *Nken* that "there is a public interest in preventing" wrongful government action. *Id.* at 435–36.

[32] *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (emphasis in original) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)).

[33] *Chalk v. U.S. Dist. Court*, 840 F.2d 701, 704 (9th Cir. 1988); *see also Heckler v. Lopez*, 463 U.S. 1328, 1333 (1983) (a prohibitory injunction "freezes the positions of the parties until the court can hear the case on the merits").

[34] *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 484 (1996).

*The Alaska Landmine, LLC et al., v. Dunleavy et al.*                            Case No. 3:20-cv-00311-JMK
Order Granting Preliminary Injunction                                           Page 6

Case 3:20-cv-00311-JMK    Document 32    Filed 01/22/21    Page 6 of 19

maintaining the status quo [p]endente lite [and] is particularly disfavored.'"[35] In general, mandatory injunctions "are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages."[36]

Injunctive relief is an equitable remedy, and "[t]he essence of equity jurisdiction is the power of the court to fashion a remedy depending upon the necessities of the particular case."[37]

### III. ANALYSIS

#### A. Constitutional Issues in Plaintiffs' Claims

The analytical path begins with an analysis of the four *Winter* prongs that the Plaintiffs must establish, beginning with the likelihood of success on the merits of Plaintiff's constitutional claims.

Plaintiffs have brought claims under the First Amendment and the due process clause of the Fourteenth Amendment. Plaintiffs' claims are predicated on journalistic access, or the lack thereof. The First Amendment does not explicitly provide a right of access to the press.[38] However, the Supreme Court has acknowledged that

---

[35] *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1980) (quoting *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976)).
[36] *Id.* at 1115 (quoting *Clune v. Publishers' Ass'n of N.Y. City*, 214 F.Supp. 520, 531 (S.D.N.Y. 1963)).
[37] *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1022 (9th Cir. 2009) (citing *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 175 (9th Cir. 1987)).
[38] *See, e.g., Branzburg v. Hayes*, 408 U.S. 665, 684 (1972) (noting that the First Amendment "does not guarantee the press a constitutional right of special access to information not available to the public generally").

*The Alaska Landmine, LLC et al., v. Dunleavy et al.*            Case No. 3:20-cv-00311-JMK
Order Granting Preliminary Injunction            Page 7

Case 3:20-cv-00311-JMK   Document 32   Filed 01/22/21   Page 7 of 19

"without some protection for seeking out the news, freedom of the press could be eviscerated."[39] Notably, this Court recognizes that the Bill of Rights expresses limits on the government relating to individual citizens, with one notable exception: the Press clause of the First Amendment, which prohibits the government's ability to "abridge[e] the freedom of the press."[40] In other words, it is the institution of the press that is the target of protection, due to the institution's service to the citizenry.[41]

The questions here, simply stated, are: Do members of the press have a First Amendment right concerning access to the Governor's press conferences, and what, if any, due process is implicated by the exclusion of members of the press from such press conferences? These simple questions evoke nuanced and complex answers.

### B. Press Conferences and Forum Analysis in First Amendment Context

It is perhaps prudent to begin with a discussion of a "press conference" as a vehicle of information to both the media and the public. In a general sense, a press conference is a form of access granted "pursuant to official duties."[42] As relevant here, the practice of the Governor is to afford media access to his press conferences, while also allowing for the inert participation of the public.[43]

---

[39] *Id*.
[40] U.S. Const. amend. I.
[41] Consider these words in Thomas Jefferson's January 28, 1786, letter to James Currie: "Our liberty depends on the freedom of the press, and that cannot be limited without being lost." *See* extract available at https://tjrs.monticello.org/letter/2141#X3184736 (last accessed January 21, 2021).
[42] *See Sherrill v. Knight*, 569 F.2d 124, 126 (D.C. Cir. 1977).
[43] The current COVID-19 pandemic has created a temporary alteration of the status quo relating to differences in access between the public and the press. Although the current practice

*The Alaska Landmine, LLC et al., v. Dunleavy et al.*            Case No. 3:20-cv-00311-JMK
Order Granting Preliminary Injunction            Page 8

Case 3:20-cv-00311-JMK   Document 32   Filed 01/22/21   Page 8 of 19

Restrictions on accessing a gubernatorial press conference are analyzed under the three-step framework of the public forum doctrine.[44] A traditional public forum, e.g., public streets, is "open to anyone where citizens are traditionally free to speak without governmental approval or interference. Speakers cannot be excluded from a traditional public forum without a compelling government interest."[45] "But in 'nonpublic forums,' access may be restricted 'as long as the restrictions are reasonable and are not an effort to suppress expression merely because public officials oppose the speaker's view.'"[46]

The first step in the public forum analysis is a determination as to whether the activity Plaintiffs seek to engage in is protected under the First Amendment.[47] Here, where it is recognized that the First Amendment "provides at least some degree of protection for gathering news and information, particularly news and information about the affairs of the government,"[48] Plaintiffs' attendance at the Governor's press conferences certainly is protected.

---

of media members virtually attending press conferences that are simultaneously livestreamed for the public would suggest that press access is but a nominal benefit, this Court recognizes that this oddity is likely fleeting. As a result, this Court conducts its analysis under the assumption that press conferences in the future will mirror the press conferences conducted prior to the COVID-19 pandemic, meaning that press will be physically present as opposed to attending virtually.

[44] *See John K. Maciver Inst. for Pub. Policy v. Evers*, No. 19-CV-649-JDP, 2020 WL 1531637, at *5 (W.D. Wis. Mar. 31, 2020) (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983)).
[45] *Id*. (citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S 788, 800 (1985)).
[46] *Id*.
[47] *Id*. (citing *Cornelius*, 473 U.S. at 797; *Am. Civil Liberties Union of Illinois v. Alvarez*, 679 F.3d 583, 597–600 (7th Cir. 2012)) (concluding that accessing a governor's press conference for the purposes of media reporting is protected by the First Amendment).
[48] *Id*.

*The Alaska Landmine, LLC et al., v. Dunleavy et al.*                                          Case No. 3:20-cv-00311-JMK
Order Granting Preliminary Injunction                                                           Page 9

Case 3:20-cv-00311-JMK    Document 32    Filed 01/22/21    Page 9 of 19

The second step is to determine whether the forum is public or nonpublic, which guides the Court to apply the proper level of constitutional scrutiny to the purported restrictions.[49] Like Governor Evers' press conferences, Defendant Governor Dunleavy's press conferences are nonpublic forums.

Finally, the Court applies the proper level of scrutiny to the access restrictions. "For a nonpublic forum, the question is whether the restrictions are (1) reasonable and (2) not an effort to suppress an opposing viewpoint."[50] The remainder of the Court's analysis here, then, is whether Defendants' restrictions meet these requirements.

The First Amendment secures "the paramount public interest in a free flow of information to the people concerning public officials," which, when coupled with the Fourteenth Amendment, serve to protect the right of the public to receive published information and ideas.[51] The Supreme Court has articulated the importance of the press as it relates to elected officials:

> The Constitution specifically selected the press . . . to play an important role in the discussion of public affairs. Thus the press serves and was designed to serve as a powerful antidote to any abuses of power by government officials and as a constitutionally chosen means for keeping officials elected by the people responsible to all the people whom they were elected to serve.[52]

However, that articulation serves as a mere foundation for this Court's consideration of the interplay between the government and the press.

---

[49] *Id*. (citing *Cornelius*, 473 U.S. at 800).
[50] *Id*.
[51] *Pell v. Procunier*, 417 U.S. 817, 832 (1974) (internal quotations omitted).
[52] *Mills v. Alabama*, 384 U.S. 214, 219 (1966).

*The Alaska Landmine, LLC et al., v. Dunleavy et al.*  Case No. 3:20-cv-00311-JMK
Order Granting Preliminary Injunction  Page 10

Case 3:20-cv-00311-JMK   Document 32   Filed 01/22/21   Page 10 of 19

The parties appear to agree as to two First Amendment concepts: (1) Content-based inclusion or exclusion is prohibited by the First Amendment[53]; and (2) First Amendment rights provide for access, but not interaction. However, the parties' respective interpretations of that first core concept are markedly different when compared to the facts here.

## C. First Amendment and Due Process

Although not binding authority, cases from the D.C. Circuit offer guidelines as to the lens through which this Court should consider the issues at the heart of this dispute. In *Sherrill v. Knight*, the court considered a journalist's challenge to the denial of a White House press pass.[54] In that case, the journalist argued that the absence of any published or internal policies regarding the issuance of press passes constituted a violation of both the First and Fifth Amendments.[55] In response, the government argued that the right of access due to the press is generally no greater than the right of access the public holds and therefore the absence of guidelines could only violate the First Amendment if denial was predicated on the content of the journalist's work.[56] In other words, the government

---

[53] *See, e.g., Police Dept. of Chicago v. Mosley*, 408 U.S. 92 (1972); *Consumers Union v. Periodical Corr. Ass'n*, 365 F.Supp. 18 (D.D.C. 1973), rev'd as nonjusticiable, 515 F.2d 1341 (D.C. Cir. 1975), cert. denied, 423 U.S. 1051 (1976); *Borreca v. Fasi*, 369 F.Supp. 906 (D. Haw. 1974); *Quad-City Community News Service, Inc. v. Jebens*, 334 F.Supp. 8 (S.D. Iowa 1971). *Cf. Lewis v. Baxley*, 368 F.Supp. 768 (M.D. Ala. 1973) (striking down financial disclosure requirement for newsmen).
[54] 569 F.2d 124 (D.C. Cir. 1977).
[55] *Id.* at 126–28. The Fifth Amendment was implicated in *Sherrill* because the state actor was the federal government; in the instant case the analogous analysis involves the Fourteenth Amendment.
[56] *Id.* at 129.

*The Alaska Landmine, LLC et al., v. Dunleavy et al.*                        Case No. 3:20-cv-00311-JMK
Order Granting Preliminary Injunction                                                                          Page 11

Case 3:20-cv-00311-JMK    Document 32    Filed 01/22/21    Page 11 of 19

contended that any denials of access were permissible, regardless of "process," as long as such denials were not triggered by the content of the journalist's speech.[57] The court was not persuaded, concluding that media access to government facilities should "not be denied arbitrarily or for less than compelling reasons."[58] It held that due process is not merely essential to the press, but also the public:

> Not only newsmen and the publications for which they write, but also the public at large have an interest protected by the first amendment in assuring that restrictions on newsgathering be no more arduous than necessary, and that individual newsmen not be arbitrarily excluded from sources of information.[59]

In essence, given the import of First Amendment rights, the government must publicly memorialize the applicable standards to ensure both due process and compelling government interests for any and all denials of access.[60]

Although factually distinguishable, the D.C. Circuit later affirmed the due process rationale of *Sherrill* in *Getty Images News Services, Corp. v. Department of Defense*, holding that when the First Amendment rights of the press are implicated, "at a minimum . . . before determining which media organizations receive . . . access, [the government] must not only have some criteria to guide its determinations, but must have a reasonable way of assessing whether the criteria are met."[61] As relevant here, in the midst of litigation, the government in *Getty* offered four criteria that it considered in determining

---

[57] *Id*.
[58] *Id*.
[59] *Id*. at 129–30.
[60] *See id*.
[61] 193 F. Supp. 2d 112, 121 (D.C. Cir. 2002).

*The Alaska Landmine, LLC et al., v. Dunleavy et al.*  Case No. 3:20-cv-00311-JMK
Order Granting Preliminary Injunction  Page 12

Case 3:20-cv-00311-JMK   Document 32   Filed 01/22/21   Page 12 of 19

which media would receive invitations but admitted that the criteria were not memorialized nor accompanied by any applicable procedures governing determinations.[62] The court found this to be a fatal flaw:

> The sensible way to gather this information and to satisfy the due process concerns implicated by restrictions on First Amendment rights is to publish (i.e., make available to potentially interested parties in writing or otherwise) the criteria used in [the government's] selection process and provide a way for applicant media organizations to submit information demonstrating that they satisfy the criteria.[63]

The overarching principles applied in these cases suggest that covert, unwritten policies are per se violations of due process.

Finally, as discussed in *Sherrill* and *Getty* above, it is important to understand exactly what First Amendment right due process serves to protect: access to information. There is an important distinction between a right of access and a right of interaction. The former is clearly protected by the First Amendment, while the latter is solely at the discretion of the government.[64] In other words, a government official cannot improperly, or without due process, restrict the access of a journalist to a press conference; however, that government official may decline to take or answer questions from a journalist at any such event.

### D. Likelihood of Success on the Merits – Due Process

Plaintiffs argue that "once the government has created a forum for general newsgathering and uses a credentialing process to limit who may access that forum, the

---

[62] *See id.* at 115.
[63] *Id.* at 121.
[64] *See e.g. Baltimore Sun v. Ehrlich*, 437 F.3d 410, 420–21 (4th Cir. 2006).

*The Alaska Landmine, LLC et al., v. Dunleavy et al.*  Case No. 3:20-cv-00311-JMK
Order Granting Preliminary Injunction  Page 13

Case 3:20-cv-00311-JMK   Document 32   Filed 01/22/21   Page 13 of 19

government must provide . . . basic due-process principles."[65] The government responds that Plaintiffs lack any "constitutionally protected First Amendment liberty interest," and thus, "no due process analysis is warranted."[66] It claims that cases such as *Sherrill* are not applicable, because the government here has no process for the credentialling of media, and thus Mr. Landfield and every other journalist cannot consider themselves a member of the press from the perspective of the First Amendment. Taken to its logical end, the government asserts that the lack of process not only defeats Plaintiffs' claims, but strips all other media members covering the governor's press conferences of First Amendment protections.

Setting aside the lack of binding case law, an acceptance of the government's contentions would be both illogical and constitutionally incongruous. The government is essentially arguing that members of the press, regardless of whether that is a formal or colloquial construct, cannot succeed on any due process claims precisely because the government lacks any due process relating to the media's access to the governor's press conferences. In other words, the government's position is that Plaintiffs' are not entitled to due process precisely because the government has not provided due process. A vexing syllogism if ever there were one.[67]

First Amendment due process claims are not so easily avoided by an intentional choice of the government to abstain from creating written policies and protocol.

---

[65] Docket 27 at 11.
[66] Docket 21 at 22.
[67] Acceptance of the government's arguments would effectively stand for the proposition that First Amendment rights do not exist for any members of the media in Alaska.

*The Alaska Landmine, LLC et al., v. Dunleavy et al.*   Case No. 3:20-cv-00311-JMK
Order Granting Preliminary Injunction   Page 14

Case 3:20-cv-00311-JMK   Document 32   Filed 01/22/21   Page 14 of 19

> Discriminatory governmental action aimed at the communicative impact of expression is presumptively at odds with the First Amendment [and a]bove all else, the First Amendment means that the government cannot restrict freedom of expression on the basis of its ideas, message or content.[68]

Here, it is impossible for this Court to determine whether the government is culpable of restricting access for impermissible reasons because of an absence of process and accompanying established written policy to analyze. Plaintiffs' First Amendment interests clearly constitute a liberty which may not be denied without due process of law under the Fourteenth Amendment. This Court cannot find that the rights at the heart of the First Amendment are so tenuous and fleeting that they can be avoided through the government's refusal to offer any due process. It is untenable to assume that a cornerstone of our nation's Bill of Rights could be so impotent that it could be extinguished by simple apathy or indifference. Mirroring the rationale articulated in *Sherrill*, this Court holds that the Plaintiffs are likely to succeed on their due process claims given the government's failure to memorialize an explicit and meaningful standard governing its denial of press conference access.

### E. Likelihood of Success on the Merits – First Amendment

This Court has also been asked to consider the parties' arguments related to whether the Government's reasons for excluding Plaintiffs from the Governor's press conferences constituted an impermissible content-based decision. As an initial matter, having already determined that Plaintiffs are likely to succeed on their due process claim,

---

[68] *Times-Picayune Publ'g Co. v. Lee*, 15 Media L. Rep. 1713, at *9 (E.D. La. April 15, 1988) (citing *Cohen v. Cox,* 403 U.S. 75, 24 (1971); *NAACP v. Button,* 371 U.S. 415, 445 (1963); *Terminiello v. Chicago,* 337 U.S. 1, 4 (1949)).

*The Alaska Landmine, LLC et al., v. Dunleavy et al.*  Case No. 3:20-cv-00311-JMK
Order Granting Preliminary Injunction  Page 15

Case 3:20-cv-00311-JMK   Document 32   Filed 01/22/21   Page 15 of 19

analysis of the First Amendment content-based restriction claim itself is unnecessary from a procedural perspective. Furthermore, the facts and assertions relating to the reasons for Plaintiffs exclusion are tenuous and less developed. This is due, in large part, to the rationale stated above. The absence of any formal process, policy, or procedure makes meaningful judicial review difficult, if not impossible. It also highlights the importance of due process as the vehicle by which First Amendment rights are protected.

Here, Mr. Landfield enjoyed an implicit press credentialing[69] and access to the current Governor's press conferences beginning January 23, 2019.[70] Defendants then implicitly revoked Mr. Landfield's press credentials in October 2019 absent any explanation. Defendants initially indicated that the removal was an "oversight" in response to Plaintiffs' inquires. However, the revocation was never remedied or rescinded. Only after Plaintiffs initiated the current litigation did Defendants articulate that they followed an unwritten "no blogger" policy, which served as the impetus for Plaintiffs' exclusion. Plaintiffs contend that the unwritten "no blogger" policy is merely a post hoc rationalization for what was truly an impermissibledecision by Defendants to implement a content-based exclusion.

Ultimately, this Court need not resolve the parties' dispute over whether the Defendants' purported policy had long existed by October 2019, whether it is merely a strategic decision that was adopted as part of litigation, and in either case, the extent to

---

[69] Because Defendants do not issue press credentials as their legislative counterparts do, *see* note 20, *supra*, Defendant's inclusion of individuals at press conferences is viewed as tacit acknowledgement of their press responsibilities.

[70] Docket 5 at 8.

*The Alaska Landmine, LLC et al., v. Dunleavy et al.*  Case No. 3:20-cv-00311-JMK
Order Granting Preliminary Injunction  Page 16

Case 3:20-cv-00311-JMK   Document 32   Filed 01/22/21   Page 16 of 19

which that policy has been faithfully and consistently applied, because, as stated above, this Court has already determined Plaintiffs' likelihood of success on their due process claims. Furthermore, indefinite articulation of that policy suggests that it would be difficult and perhaps premature for this Court to offer thoughts as to whether that policy would survive judicial scrutiny.

### E. Having established a likelihood of success on the merits, the remaining *Winter* factors are met

#### i. Irreparable harm

The harms associated with a First Amendment violation cannot typically be redeemed with damages. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."[71] Therefore, courts have concluded that violations, such as the one at issue here, constitute harm that is irreparable. Accordingly, this Court finds that the movants in this case will suffer irreparable injury if the injunction is not granted. Without an injunction enjoining the government from excluding Mr. Landfield from their media advisory list absent a consistently applied, neutral media invitee policy, Plaintiffs are subject to irreparable harm.

#### ii. Pandemic effects on harm determination

Current extenuating circumstances create a slight alteration of the legal analysis than in the cases discussed. Harm is admittedly *de minimis* while the COVID-19 pandemic requires events like press conferences to be held virtually and the governor's

---

[71] *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (cited in *Sammartano v. First Judicial Dist. Court, in & for Cty. of Carson City*, 303 F.3d 959, 973 (9th Cir. 2002)).

*The Alaska Landmine, LLC et al., v. Dunleavy et al.*                                 Case No. 3:20-cv-00311-JMK
Order Granting Preliminary Injunction                                                Page 17

Case 3:20-cv-00311-JMK    Document 32    Filed 01/22/21    Page 17 of 19

office offers a public livestream that anyone can access. However, this Court, absent evidence to the contrary, assumes that there will be a return to in-person events in the near future where an individual who is not invited to press conferences will not be able to access the information disseminated in them or report on that information.[72]

### iii. Balance of equities and public interest

Because the defendants are government representatives in their official capacities, these *Winter* factors merge.[73] The Court recognizes a public interest in the access of individuals meeting certain criteria to newsgather and report to the public. The burden of an injunction on the government is minimal. The government has failed to present any evidence that individuals similarly situated to Mr. Landfield have also requested access to the governor's press conference, and, thus, this Court cannot lend credence to hypothetical fears that this injunction will result in logistical hardship to the governor's press office. Furthermore, as articulated above, the foundational principle of the press clause of the First Amendment is that the media serves the public in offering both governmental transparency and information to the citizenry.

## IV. CONCLUSION

Judicial restraint suggests that it is not the role of this Court to dictate a prescriptive ruling mandating a specific process or procedure for the government to adopt. Defendants are free to continue interacting with the press absent any formal policies

---

[72] *See* note 39, *supra*.
[73] *See* note 28, *supra*.

*The Alaska Landmine, LLC et al., v. Dunleavy et al.*                 Case No. 3:20-cv-00311-JMK
Order Granting Preliminary Injunction                                                        Page 18

Case 3:20-cv-00311-JMK   Document 32   Filed 01/22/21   Page 18 of 19

governing those interactions. The granting of this preliminary injunction is intentionally limited to order that Defendants afford Plaintiffs the same manner of access to press conferences that it provides other members of the media. It is also important to note that this mandate is limited to affording access to Plaintiffs in a manner commensurate with other members of the media, but that access does not include a broader right of engagement and, thus, the Governor possesses the discretion to refrain from calling on Plaintiffs or answering their questions.

IT IS SO ORDERED this 22nd day of January, 2021, at Anchorage, Alaska.

*/s/ Joshua M. Kindred*
JOSHUA M. KINDRED
United States District Judge

*The Alaska Landmine, LLC et al., v. Dunleavy et al.*  Case No. 3:20-cv-00311-JMK
Order Granting Preliminary Injunction  Page 19

Case 3:20-cv-00311-JMK   Document 32   Filed 01/22/21   Page 19 of 19